## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL WILLIAMS, KELLIE PREVOST, SCOTT WARBURTON, DEMETRIA TOBUTIS, RICHARD MEKETON, and LISA MIKEC, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBCUNIVERSAL MEDIA, LLC, NBC NEWS DIGITAL, LLC, and the COMCAST CORPORATION,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Michael Williams, Kellie Prevost, Scott Warburton, Demetria Tobutis, Richard Meketon, and Lisa Mikec (together, "Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendants NBCUniversal Media, LLC ("NBCUniversal"), NBC News Digital, LLC ("NBC Digital"), and the Comcast Corporation ("Comcast") (together, "NBC" or "Defendants") based on personal knowledge, where applicable, information and belief, and the investigation of counsel.

### INTRODUCTION

1.      Defendant NBCUniversal is one of the largest media conglomerates and video content providers in the United States. NBCUniversal owns and operates several media networks, including NBC Sports, Bravo, and CNBC. NBCUniversal also owns Defendant NBC Digital, a division of NBCUniversal News Group, which operates NBC News, MSNBC, and other brands.

2.      NBC owns and operates several video streaming apps including the NBC App, the NBC News App, the MSNBC App, the NBC Sports App, and the Bravo App (collectively, "NBC

Apps"). These NBC Apps offer subscribers access to a wide array of prerecorded video content including TV shows, movies, trailers, and clips concerning news, politics, financial and market segments, and sports. Millions of individuals subscribe to NBC Apps to view prerecorded video content each year, including Plaintiffs, who collectively subscribed to each of these apps.

3.      Unbeknownst to NBC App users, NBC disclosed individuals' private video viewing history with personally identifiable information in the form of names, email addresses, and/or GPS location to third-party identity service providers through tracking technology embedded in each of the NBC Apps. These identity services—which include, at least mParticle—are designed to aggregate user data across every website and app implementing their technology into a profile that identifies a *particular person* for advertisers.

4.      To accomplish this, identity service providers, including each of those used by the NBC Apps, map directly identifiable personal information, such as an individual's name, email address, postal address, and phone number, to an identity profile. Each time an individual uses a connected app or website, like one of the NBC Apps, the identity service provider's tracking technology queries a centralized identity resolution service that, like giant digital phone book, finds the profile associated with that specific individual and incorporates information about that person's web and app activity. Advertisers pay to access this unique individualized profile to facilitate targeted advertising to that specific individual across all internet-connected devices, including tablets, phones, computers, and Smart TVs.

5.      The video viewing history the NBC Apps transmit to these identity service providers is individually identifiable for at least two separate reasons. First, the NBC Apps share highly personal information reflecting users' video viewing history alongside information that

identifies a specific person *on its face,* such as the individual's name, email address, and/or precise geolocation coordinates.

6.      Second, while not necessary to identify users because video viewing history is transmitted with information that is directly identifiable, the NBC Apps also transmit all video viewing histories with persistent unique identifiers—including unique cross-platform tracking codes generated by the identity service providers above. Using either the individual's name, email address or precise geolocation, or the persistent unique identifiers, mParticle then joins that individual's video viewing history with the specific identity profile for that NBC App user. As a result, NBC App users' video viewing histories are not only mapped to identity service providers' individual user profiles as described herein, but are also available to any marketer who queries mParticle's IDSync User Profiles.

7.      This conduct violates both the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* (the "VPPA") and the New York Video Consumer Privacy Act, N.Y. GBL § 670, *et seq.* (the "NY VCPA"), which prohibit NBC from disclosing identifiable video viewing history information about Plaintiffs and other Class members. NBC knew its conduct violated these statutes because: (1) it programmed the NBC Apps specifically to transmitted personally identifiable video viewing history to identity service providers, including mParticle, and (2) it did so without obtaining consent from Plaintiffs or Class members in the form required by the statutes.

8.      NBC's unauthorized disclosure of Plaintiffs' and Class members' video viewing history and identifiable data also constitutes a deceptive trade practice that is a separate violation of N.Y. Gen. Bus. Law § 349.

9.      Given the ongoing, surreptitious nature of NBC's transmission of identifiable video viewing history, Plaintiffs are confident additional information demonstrating the violation will be

revealed in discovery, including the personally identifiable profiles NBC's identity service providers maintain about them.

**PARTIES**

**A.      Plaintiffs**

**1.      Michael Williams**

10.     Plaintiff Michael Williams ("Williams") is a citizen and resident of the Bronx, New York.

11.     Plaintiff Williams subscribed to the NBC App in approximately fall 2020. He used the NBC App between fall 2020 and January 2023. Plaintiff Williams provided, at least, his name and email address to Defendants in connection with subscribing to the NBC App.

12.     Plaintiff Williams subscribed to the NBC News App in May 2021. Plaintiff Williams provided, at least, his name and email address to Defendants in connection with subscribing to the NBC News App.

13.     Plaintiff Williams subscribed to the NBC Sports App in early 2023. Plaintiff Williams provided, at least, his name and email address to Defendants in connection with subscribing to the NBC Sports App.

14.     Plaintiff Williams used the NBC App, the NBC News App, and the NBC Sports App on his iPhones to view prerecorded video content available to subscribers.  During these periods, Plaintiff Williams was the only person with access to his iPhones.

15.     Unbeknownst to Plaintiff Williams, Defendants disclosed, at least, the titles of prerecorded videos he viewed on the NBC News App and the NBC Sports App to identity service providers alongside personally identifiable information, as described herein.

16.     For instance, when Plaintiff Williams used the NBC Sports App, Defendants transmitted, at least, Plaintiff Williams' email address with video viewing data to mParticle.

17.    In addition to being directly identifiable on its face, as an identity service provider, mParticle joined Plaintiff Williams' email address, as well as his video viewing history, to his mParticle identity profile. This profile incorporated all data mParticle received from the NBC Apps.

18.    Plaintiff Williams' activity (including his video viewing history) across all NBC Apps, as a result, was directly identifiable to at least mParticle, and to any marketer who viewed his mParticle identity profile. For example, when Plaintiff Williams used the NBC News App to view video content, Defendants disclosed his GPS location and video viewing data to mParticle. Defendants' disclosure of personally identifiable information which was directly identifiable, allowed mParticle, or any other ordinary recipient to identify Plaintiff Williams, with little or no extra effort, as the unique individual using the NBC News App to view these videos. Plaintiff Williams' video history was also identifiable to anyone who accessed his mParticle identity profile.

19.    Similarly, when Plaintiff Williams used the NBC Sports App, Defendants disclosed, at least, his email and video viewing data to mParticle. This allowed mParticle and any other ordinary recipient to identify Plaintiff Williams, with little or no extra effort, as the unique individual using the NBC Sports App to view these videos. Plaintiff Willliams' video history was also identifiable to anyone who accessed his mParticle identity profile.

20.    Plaintiff Williams' identifiable video viewing data across all NBC Apps was consolidated and stored in a unique user profile by mParticle precisely to facilitate targeted advertising and reach Plaintiff Williams with these ads across all his internet-connected devices.

21.     Plaintiff Williams did not consent to Defendants' disclosure of his video viewing history to mParticle, or any identity service providers, each of which could identify him and associate this video viewing history with his specific identity profile as described herein.

**2.      Kellie Prevost**

22.     Plaintiff Kellie Prevost ("Prevost") is a citizen and resident of Rochester, NY.

23.     Plaintiff Prevost subscribed to the NBC Sports App in approximately August or September 2020 and used it until sometime in 2022. Plaintiff Prevost provided, at least, her name and email address to Defendants in connection with subscribing to the NBC Sports App.

24.     Plaintiff Prevost subscribed to the NBC News App in approximately 2019 and used it until sometime in 2021. Plaintiff Prevost provided, at least, her name and email address to Defendants in connection with subscribing to the NBC News App.

25.     Plaintiff Prevost subscribed to the MSNBC App approximately at some point in 2021 and used it for approximately one year. Plaintiff Prevost provided, at least, her name and email address in connection with subscribing to the MSNBC.

26.     Plaintiff Prevost used the NBC Sports App, the NBC News App, and the MSNBC App on her Samsung Galaxy mobile phones and/or iPhones[1] to view prerecorded video content available to subscribers.  During these periods, Plaintiff Prevost was the only person with access to these devices.

27.     Unbeknownst to Plaintiff Prevost, Defendants disclosed, at least, the titles of prerecorded videos she viewed on the NBC News App, the NBC Sports App, and the MSNBC App to identity service providers alongside personally identifiable information as described herein.

---

[1] Plaintiff Prevost had Samsung Galaxy mobile phones from approximately 2019 to sometime in 2022 and used an iPhone from 2023 to the present.

28.    For instance, when Plaintiff Prevost used the NBC Sports App, Defendants transmitted, at least, Plaintiff Prevost's email address with video viewing data to mParticle.

29.    In addition to being directly identifiable on its face, as an identity service provider, mParticle joined Plaintiff Prevost's email address, as well as her video viewing history, to her mParticle identity profile. This profile incorporated all data mParticle received from the NBC Apps.

30.    Plaintiff Prevost's activity (including her video viewing history) across all NBC Apps, as a result, was directly identifiable to at least mParticle, and to any marketer who viewed her mParticle identity profile. For example, when Plaintiff Prevost used the NBC News App to view video content, Defendants disclosed, at least, her GPS location and video viewing data to mParticle. Defendants disclosed personally identifiable information which was directly identifiable and allowed mParticle, or any other ordinary recipient to identify Plaintiff Prevost, with little or no extra effort, as the unique individual using the NBC News App to view these videos. Plaintiff Prevost's video history was also identifiable to anyone who accessed her mParticle identity profile.

31.    Likewise, when Plaintiff Prevost used the MSNBC App, Defendants disclosed her email address and video viewing data to mParticle. This allowed mParticle and anyone who viewed Plaintiff Prevost's identity profile to identify Plaintiff Prevost as the unique individual using the MSNBC App to view these videos, through her directly identifiable email.

32.    Plaintiff Prevost's identifiable video viewing data across all NBC Apps was consolidated and stored in a unique user profile by mParticle precisely to facilitate targeted advertising and reach Plaintiff Prevost with these ads across all her internet-connected devices.

33.     Plaintiff Prevost did not consent to Defendants' disclosure of her video viewing history to mParticle, or any identity service providers, each of which could identify her and associate this video viewing history with her specific identity profile as described herein.

**3.      Scott Warburton**

34.     Plaintiff Scott Warburton ("Warburton") is a citizen and resident of Brooklyn, New York.

35.     Plaintiff Warburton subscribed to the NBC App in approximately June 2022. Plaintiff Warburton provided, at least, his name and email address to Defendants in connection with subscribing to the NBC App.

36.     Plaintiff Warburton subscribed to the NBC Sports App in approximately June 2022. Plaintiff Warburton provided, at least, his name and email address to Defendants in connection with subscribing the NBC Sports App.

37.     Plaintiff Warburton subscribed to the Bravo App in approximately June 2022. Plaintiff Warburton provided, at least, his name and email address to Defendants in connection with subscribing to the Bravo App.

38.     Plaintiff Warburton used the NBC App, the NBC Sports App, and the Bravo App on his iPhone to view prerecorded video content available to subscribers. Plaintiff Warburton was and is the only person with access to his iPhone.

39.     Unbeknownst to Plaintiff Warburton, Defendants disclosed, at least, the titles of prerecorded videos he viewed on the NBC Sports App to identity service providers alongside personally identifiable information.

40.     In addition to being directly identifiable on its face, as an identity service provider, mParticle joined Plaintiff Warburton's name and email address, with his video viewing history, to

his mParticle identity profile. This profile incorporated all data mParticle received from the NBC Apps.

41.     Plaintiff Warburton's activity (including viewing history) across all NBC Apps, as a result, was directly identifiable to at least mParticle, and to any marketer who viewed his mParticle identity profile. For example, when Plaintiff Warburton used the NBC Sports App, Defendants disclosed, at least, his email address with video viewing data to mParticle. When he used the Bravo App, Defendants transmitted at least his first name, last name, zip code, gender, and email address with video viewing data to mParticle. And when he used the NBC App, Defendants also transmitted his first name, last name, zip code, email, and gender to mParticle with video viewing information. Defendants disclosed personally identifiable information which was directly identifiable and allowed mParticle, or any other ordinary recipient to identify Plaintiff Warburton, with little or no extra effort, as the unique individual viewing videos in these NBC Apps. Plaintiff Warburton's video history was also identifiable to anyone who accessed his mParticle identity profile.

42.     Plaintiff Warburton's identifiable video viewing data across all NBC Apps was consolidated and stored in a unique user profile by mParticle precisely to facilitate targeted advertising and reach Plaintiff Warburton with these ads across all her internet-connected devices.

43.     Plaintiff Warburton did not consent to Defendants' disclosure of his video viewing history to mParticle, or any identity service providers, each of which could identify him and associate this video viewing history with his specific identity profile as described herein.

### 4.    Demetria Tobutis

44.     Plaintiff Demetria Tobutis ("Tobutis") is a citizen and resident of Comal, Texas.

45.    Plaintiff Tobutis subscribed to the MSNBC App in approximately the middle of 2018. At that time, Plaintiff Tobutis provided, at least, her name and email address to Defendants in connection with subscribing to the MSNBC App.

46.    Plaintiff Tobutis also subscribed to the NBC App in approximately the middle of 2018. At that time, Plaintiff Tobutis provided, at least, her name and address to Defendants in connection with subscribing to the NBC App.

47.    Plaintiff Tobutis has also been long-time subscriber to the NBC Sports App. Plaintiff Tobutis provided, at least, her name and email address to Defendants in connection with subscribing to the NBC Sports App.

48.    Plaintiff Tobutis used and uses the MSNBC App, the NBC App, and the NBC Sports App to view prerecorded video content available to subscribers on her mobile devices. Plaintiff Tobutis was and is the only person with access to her devices.

49.    Unbeknownst to Plaintiff Tobutis, Defendants disclosed, at least, the titles of prerecorded videos she viewed on the MSNBC App, the NBC App, and the NBC Sports App to identity service providers alongside personally identifiable information, as described herein.

50.    In addition to being directly identifiable on its face, as an identity service provider, mParticle joined Plaintiff Tobutis' email address, with her video viewing history, to her mParticle identity profile. This profile incorporated all data mParticle received from the NBC Apps.

51.    Plaintiff Tobutis' activity (including her video viewing history) across all NBC Apps, as a result, was directly identifiable to at least mParticle, and to any marketer who viewed her mParticle identity profile. For example, when Plaintiff Tobutis used the NBC Sports App, Defendants transmitted, at least, Plaintiff Tobutis' email address with video-viewing data to mParticle. Similarly, when Plaintiff Tobutis used the MSNBC App, Defendants disclosed her

email address and video viewing data to mParticle. And when she used the NBC App, Defendants also transmitted her first name, last name, zip code, email, and gender to mParticle with video viewing information. Defendants disclosed personally identifiable information which was directly identifiable and allowed mParticle, or any other ordinary recipient to identify Plaintiff Tobutis, with little or no extra effort, as the unique individual viewing videos in these NBC Apps. Plaintiff Tobutis' video history was also identifiable to anyone who accessed her mParticle identity profile.

52.     Plaintiff Tobutis' identifiable video viewing data across all NBC Apps was consolidated and stored in a unique user profile by mParticle precisely to facilitate targeted advertising and reach Plaintiff Tobutis with these ads across all his internet-connected devices.

53.     Plaintiff Tobutis did not consent to Defendants' disclosure of her video viewing history to mParticle, or any identity service providers, each of which could identify her and associate this video viewing history with her specific identity profile as described herein.

### 5.    Richard Meketon

54.     Plaintiff Richard Meketon ("Meketon") is a citizen and resident of Philadelphia, Pennsylvania.

55.     Plaintiff Meketon subscribed to the MSNBC App in approximately 2020 or 2021. At that time, Plaintiff Meketon provided, at least, his name and email address to Defendants in connection with subscribing to the MSNBC App.

56.     Plaintiff Meketon used the MSNBC App on his Android devices to view prerecorded video content available to subscribers.  Plaintiff Meketon was and is the only person with access to his Android devices.

57.     Unbeknownst to Plaintiff Meketon, Defendants disclosed, at least, the titles of prerecorded videos he viewed on the MSNBC App to identity service providers alongside personally identifiable information, as described herein.

11

58.    In addition to being directly identifiable on its face, as an identity service provider, mParticle joined Plaintiff Meketon's email address, with his video viewing history, to his mParticle identity profile. This profile incorporated all data mParticle received from the NBC Apps.

59.    Plaintiff Meketon's activity (including his video viewing history), as a result, was directly identifiable to at least mParticle, and to any marketer who viewed his mParticle identity profile. For example, when Plaintiff Meketon used the MSNBC App, Defendants disclosed, at least, his email address and video viewing data to mParticle. This allowed mParticle and any other ordinary recipient to identify Plaintiff Meketon, with little or no extra effort, as the unique individual using the MSNBC App to view these videos. Plaintiff Meketon's video history was also identifiable to anyone who accessed his mParticle identity profile.

60.    Plaintiff Meketon's identifiable video viewing data was stored in a unique user profile by mParticle precisely to facilitate targeted advertising and reach Plaintiff Meketon with ads across all his internet-connected devices.

61.    Plaintiff Meketon did not consent to Defendants' disclosure of his video viewing history to mParticle, or any identity service providers, each of which could identify him and associate this video viewing history with his specific identity profile as described herein.

### 6.    Lisa Mikec

62.    Plaintiff Lisa Mikec ("Mikec") is a citizen and resident of Washington County, Pennsylvania.

63.    Plaintiff Mikec subscribed to the MSNBC App in February 2024. At that time, Plaintiff Mikec provided, at least, her name and email address to Defendants in connection with subscribing to the MSNBC App.

64.    Plaintiff Mikec also subscribed to the NBC Sports App in approximately May 2024. At that time, Plaintiff Mikec provided, at least, her name and email address to Defendants in connection with subscribing to the NBC Sports App.

65.    Plaintiff Mikec uses and used the MSNBC App and NBC Sports App on her iPhone device to view prerecorded video content available to subscribers. Plaintiff Mikec was and is the only person with access to her iPhone device.

66.    Unbeknownst to Plaintiff Mikec, Defendants disclosed, at least, the titles of prerecorded videos she viewed on the MSNBC App and the NBC Sports App to identity service providers alongside personally identifiable information, as described herein.

67.    In addition to being directly identifiable on its face, as an identity service provider, mParticle joined Plaintiff Mikec's email address, with her video viewing history, to her mParticle identity profile. This profile incorporated all data mParticle received from the NBC Apps.

68.    Plaintiff Mikec's activity (including her video viewing history) across all NBC Apps, as a result, was directly identifiable to at least mParticle, and to any marketer who viewed her mParticle identity profile. For example, when Plaintiff Mikec used the NBC Sports App, Defendants transmitted, at least, Plaintiff Mikec's email address with video-viewing data to mParticle. Similarly, when Plaintiff Mikec used the MSNBC App, Defendants disclosed her email address and video viewing data to mParticle. This allowed mParticle and any other ordinary recipient to identify Plaintiff Mikec, with little or no extra effort, as the unique individual using these NBC Apps to view these videos. Plaintiff Mikec's video history was also identifiable to anyone who accessed her mParticle identity profile.

69.     Plaintiff Mikec's identifiable video viewing data across all NBC Apps was consolidated and stored in a unique user profile by mParticle precisely to facilitate targeted advertising and reach Plaintiff Mikec with these ads across all her internet-connected devices.

70.     Plaintiff Mikec did not consent to Defendants' disclosure of her video viewing history to mParticle, or any identity service providers, each of which could identify her and associate this video viewing history with her specific identity profile as described herein.

**B.     Defendants**

71.     Defendant NBCUniversal Media LLC is a Delaware corporation, a subsidiary of Comcast Corporation, headquartered at 30 Rockefeller Plaza, New York, NY 10112. NBCUniversal Media LLC is the app developer of the Bravo App, the NBC App, and the NBC Sports App.

72.     Defendant NBC News Digital, LLC, a Delaware corporation, is a part of NBCUniversal News Group, a division and a wholly owned subsidiary of NBCUniversal Media, LLC.  NBC News Digital, LLC is headquartered at 30 Rockefeller Plaza, New York, NY 10112. NBC News Digital, LLC is the app developer of the MSNBC App and the NBC News App.

73.     The Comcast Corporation, a Pennsylvania corporation, is a global media and technology company, which completed its acquisition of NBCUniversal, LLC in January 2011. The Comcast Corporation is headquartered at 1701 JFK Boulevard Philadelphia, PA 19103.

74.     Comcast is the owner and operator of NBCUniversal, and by extension NBC Digital.  Comcast is not a distant or uninvolved parent to these companies, as evidenced by the significant overlap in their and Comcasts' leadership teams. For example, NBCUniversal's leadership team is overseen by President of the Comcast Corporation, Michael J. Cavanagh.[2]

---

[2] *See NBCUniversal Leadership Team*, NBCUniversal, https://www.nbcuniversal.com/leadership (last visited Sept. 12, 2025) (listing Michael J. Cavanagh first, Cesar Conde second, and Kimberley D. Harris third).

Comcast also shares a Vice President, Kimberley D. Harris, with NBCUniversal. At NBCUniversal, Ms. Harris' role is that of General Counsel and she is #3 in command. NBCUniversal also shares leadership with subsidiary NBC Digital. NBCUniversal's #2 in command, Cesar Conde, is the Chairman of NBCUniversal News Group, where he oversees NBC News and other brands.

## JURISDICTION AND VENUE

75.    This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*. This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

76.    This Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and Class members' N.Y. GEN. BUS. LAW § 349 and N.Y. GEN. BUS. LAW § 670 claims because these claims arise from a common nucleus of operative facts relating to NBC's incorporation of SDKs in NBC Apps and subsequent disclosure of subscribers' personally identifiable information and video viewing history through SDKs and/or other means.

77.    This Court has general personal jurisdiction over Defendants NBCUniversal, and NBC Digital because they maintain their principal place of business in New York. Defendants are also all subject to specific personal jurisdiction in this State because they maintain sufficient minimum contacts with the State of New York and a substantial part of the events and conduct giving rise to Plaintiffs' and Class members' claims occurred in this state.

78.     Further, NBCUniversal, and NBC Digital's terms and conditions all include a forum selection clause requiring actions to be brought exclusively in the federal or state courts located in New York, New York.

79.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.    The Evolution of Person-Level Identity Solutions

80.     Digital advertising has undergone a shift in recent years from device-centric targeting to personal-level identity solutions built to identify specific individuals. Unlike earlier iterations that relied on device-level identifiers and thus treated each browser or phone as a separate "anonymous" user, modern identity solutions recognize the ***same individual*** across multiple devices and touchpoints (*i.e.*, where they interact with identity service providers).

81.     Personal-level identity solutions developed over the last several years in direct response to changes made by technology companies intended to limit third party tracking in response to consumer privacy concerns. This started at least as early as 2018 when Apple and Mozilla, developers of the Safari and Firefox web browsers, respectively, began blocking third party cookies by default.

82.     Third-party cookies are small text files placed on a user's device by domains other than the one they are visiting, such as those run by advertisers who had deployed their tracking technology on a given webpage. These cookies provide third party advertisers with a powerful tool to track device-level activity by embedding identifying information on devices that could be retrieved as a user visited different sites around the internet. For instance, a visitor to The New York Times' website would receive a third party cookie from Google, DoubleClick, or other advertiser domains, that would remain on their device and allowed browsing activity *after* leaving

The New York Times to be associated with the same person. Because certain browsers began blocking the ability for advertisers to deploy third party cookies, companies sought out a different tracking solution.

83.     Around the same time, major smartphone operating systems began allowing users to opt out of device-level tracking. Tracking at the device level on smartphones had traditionally relied on device-level identifiers, like Apple's Identifier for Advertisers ("IDFA") and Identifier for Vendors ("IDFV"), or Android' Advertising ID ("AAID"). These persistent device identifiers are recognized as personal information under various laws, including the California Consumer Privacy Act of 2018 ("CCPA"). With the release of iOS 14 in 2020, Apple allowed users to "Ask App[s] Not to Track" their activity when first launched. Advertises were so concerned with this feature that Meta (the parent company of advertising gold mines Facebook and Instagram) publicly campaigned against it, taking out full page newspaper ads ostensibly on behalf of small businesses that would be harmed if their ability to target customers with ads (on Meta's ad platform of course) was reduced. Android adopted a similar feature shortly after Apple's iOS update, which gave nearly all users in the United States the option to opt out of this form of app tracking.

84.     Rather than respect user's privacy choices or follow the clear public trend developing against online tracking, several companies instead developed identity solutions to fill the gap left by third party cookies and device identifiers with new tracking techniques. But these second-generation identity solutions were not just a replacement for the device-level tracking being left behind, they were a major improvement that capitalized on advancements in data science, artificial intelligence, and the sheer volume of information about individuals' web and app activity collected in the years since the initial wave of privacy-centric changes to browsers and app tracking took place.

85.     Although there are slight differences among them, modern identity services overcame the limitations of device-level identifiers by adopting a hybrid approach that merged ***deterministic data***—such as email addresses, phone numbers, customer ids, and user login names—with ***probabilistic data***—such as device fingerprints,[3] browsing behavior patterns, location history, and IP addresses, to develop comprehensive identity profiles of individual people, rather than devices.

86.     This enhanced process works as follows: identity service providers collect ***deterministic data*** from apps and websites—like the NBC Apps—that integrate their services when users create an account, log in to an account, make a purchase, or take some other personally identifiable action. For example, each NBC App transmitted the user's email address and at least one other unique identifier to mParticle at login The NBC Apps also transmitted users' email addresses with video viewing information. Deterministic data identifies an individual by ***default*** because it is tied to directly identifiable data, such as a user's email address, their exact location (*e.g.*, their billing address, shipping address, or GPS location), or phone number. This deterministic data anchors the identity service provider's profile about that specific person.

87.     Identity service providers compile and use this deterministic data to track users across devices and match data to a single individual. This eliminates the issue created by older techniques whereby a user who engaged with a website on multiple devices (*e.g.*, a phone, desktop computer, tablet) would be treated as multiple separate users. The current practice of cross-device tracking combines deterministic and probabilistic approaches, where needed, to create a unified identity for each person.  For instance, if a user logs in to a website on their laptop with their email

---

[3] Device fingerprinting is a probabilistic data technique that allows advertisers to identify a unique device based on its specific collection of using seemingly innocuous attributes—like the browser it is running, which fonts it has installed, the OS version, etc.—in the absence of a device-level identifier such as an IDFA or AAID.

address, which is often required to create an account, and the same email address is used in an app on their phone, the identity service provider will tie these two devices to the person with that email address by mapping that email to a unique, cross-platform identifier created by the service provider. If there is no unique login present, *probabilistic data* can still be used to link the associated data to the *same* user's profile based on device fingerprinting, browsing history, and activity patterns at a specific location or IP address.

88.     This hybrid data model and practice of using cross-device identifiers to track users across websites and apps has dramatically improved the accuracy of identity resolution when compared to the standalone use of device-identifiers (like IDFA or AAID). Moreover, it *completely circumvents* an individual's ability to opt out of tracking. Unlike cookies, which could be cleared or deleted by users, or device identifiers, that users could opt out of, the cross-platform identifiers assigned by identity solution providers—like the mParticle ID—cannot be avoided or opted out of, making them persistent, pervasive, and extremely powerful.

89.     The sections below describe how the specific identity solutions that Defendants integrated into the NBC Apps deploy the same techniques to stitch together a unified identity profile for each *individual* NBC App user. The resulting personalized identity profiles are then used to power person-level targeted advertising and tracking across devices, platforms, and apps.

90.     The data sent to mParticle from the NBC Apps is personally identifiable on its face, regardless of mParticle's capabilities. However, mParticle and other identity service providers' ability to associate user data with specific individual user profiles further illustrates the grave harm to privacy, that results from Defendants' unauthorized disclosure of video viewing history to third parties, along with its offensive and deceptive nature.

### B.     Identity Services Deployed on the NBC Apps

####     1.     mParticle

91.      mParticle is a customer data platform designed to build individually identifiable consumer profiles for publishers and advertisers. mParticle publicly promises companies that they can help "[u]nify real-time customer interactions with data from [thei]r cloud data warehouse to power better personalization, more complete customer journey insights, and better machine learning."

92.     mParticle's identity solution is called IDSync. The purpose of IDSync is to "ensure that [the client is] attributing data to the **correct user**"—*i.e.*, a specific person and not a device. IDSync accomplishes this purpose by collecting "[e]very piece of data" about a user, and "store[ing]" this data "in a user profile" that combines "**user identities across apps and platforms**."

93.      This profile includes deterministic data, such as Customer IDs and email addresses, that directly identify an individual, as shown in in Figure 1.

**FIGURE 1**



94.     Figure 1 shows the parameters captured by mParticle, including each identity point that it claims is "based on industry best practices." Several of these data points are sent to mParticle by the NBC Apps, including email address, IDFA/IDFV, mParticle ID, and Google's Android

Advertising ID (also known as "AAID"). This data directly identifies a specific individual. Indeed, during the mParticle video presentation where this image is shown, mParticle admits: "in order for customer data to be meaningful, ***you have to be able to attribute it to a user***" as its identity service platform does.

95.    Figure 2 below provides an additional example of how developers using mParticle can "define more specific attributes about [their] user that [they] can capture and attribute to a user profile."

**FIGURE 2**



96.    To identify users, mParticle has three steps: (1) a client makes "[a]n identification request . . . via one of the mParticle platform SDKs or the HTTP API" and passes to mParticle an end user's deterministic and/or probabilistic identifying information such as email, User ID, or mParticle ID; (2) "mParticle looks for a matching user profile" by "comparing the identifiers included in the request with" identifiers already in mParticle's system; and (3) mParticle returns a matching user profile to the client if it finds a match. If there is not a match, mParticle creates a new user profile and assigns a unique mParticle ID for the purpose of future identification. Whenever a user "opens [the client's] app, an identity request is automatically made to mParticle to look for a matching user profile." If mParticle gets additional identifying information about the user at any time, it adds it to that user's existing user profile.

97.     The mParticle ID is an important building block of mParticle's identity solution. It is "a 64-bit signed integer that is used by mParticle to uniquely identity a user for the purposes of processing User Identities and Profile data." "All users" are "assigned an [mParticle] ID for the purposes of retrieving profile data" when their data is sent to mParticle. Thus, mParticle ID serves as the anchor for the user's identity profile.

98.     The mParticle ID is particularly useful because it can be shared with other advertisers and identity solution providers—such as Adobe and Branch—to enable consistent personalization and targeting across platforms. Customers like Defendants choose to send the mParticle ID to these third parties, in addition to deterministic identifiers, to support unified identity resolution and holistic behavioral tracking across different ad companies and identity solutions. For instance, if another identity service provider receives the mParticle ID alongside other identifiers (deterministic or probabilistic), it can associate that identifier with the existing profile in its Identity Graph, allowing both identity service providers, as well as the marketers who use these services, to better recognize and target the user across internet-connected devices.

99.     As Figure 3 shows, an mParticle client, like NBC, can simply type in any known identifier, like an email address, or the mParticle ID, in a search box to pull all the profile data linked to a specific user. If the client can do this, the data is equally identifiable to mParticle, who maintains the identity profile, and other marketers who use these identify profiles.

**FIGURE 3**



100.    The identity profile mParticle maintains identifies a specific individual user, and not a device.

**FIGURE 4**



101.    As Figure 4 shows above, mParticle's user profile contains at least the user's email address, mParticle ID associated with a particular person, and any other deterministic data mParticle has received about the user. mParticle also tracks the first and last time it has seen the user on app and web properties incorporating its SDK or other tracking technology. Additional non-public information about what is included in the mParticle profile associated with each NBC App users will be determined in discovery.

102.    As noted in Paragraphs 92-95, the profile mParticle maintains about each specific user also contains a "User Attributes" section. This section lists all "available user attributes" which are periodically updated from new "inbound data streams" including data sent via its SDK. These attributes can include deterministic data that directly identifies a user, including their full name, gender, phone number, address, city, state, zip code, and country. Data mParticle receives from apps and websites that use its service is mapped directly to these identifiable fields.

103.    Finally, the profile also contains event data—like the unique video ID and plain text video titles the NBC Apps sent to mParticle—as well as all audiences and advertising campaigns the user is a member of.

104.    As long as a client (here NBC) keeps mParticle's SDK or API incorporated in its app or website, mParticle "continues to collect data about the user's behavior and stores it" in the user's profile.

105.    There is no option for users to opt out of being tracked by mParticle, and their device settings (*e.g.*, "Ask App Not to Track"), or browsers settings, have no impact on this process.

106.    mParticle's SDK was incorporated in all NBC Apps, so that NBC, and mParticle and its marketers, could track individual users and their video viewing data. mParticle's SDK is present on the NBC App, NBC Sports App, NBC News App, MSNBC App, and Bravo App.

107.    mParticle's system benefits NBC, by allowing NBC to track and profile individuals who use its apps so that NBC can sell advertising to those people on a personalized, individual level. Because of how mParticle's identity solution works, all the identifiers associated with a user—***regardless of which NBC-owned app or website they came from***—are all stored in the same user profile. The NBC Apps feed this system, as described below, by passing video viewing history to mParticle that is mapped to an individual's directly identifiable, deterministic identifiers, such as email address, that are part of that specific individual's mParticle profile.

108.    The system also benefits mParticle by providing extensive user profiles, which it uses to facilitate targeted advertising through integrations with ad networks and demand side platforms ("DSPs"). mParticle integrates with dozens of advertising and marketing companies, including Branch, Adobe, and Comscore, that use information contained in user profile to target

specific individuals. mParticle is used to create and send audiences (*i.e.*, collections of specific individuals) to these advertising platforms, as well as identifiers maintained in the mParticle identity profile. Advertisers who bid for ads, including at least those served through DSPs or advertising platforms that integrate with mParticle, or use mParticle audiences, receive identifiable information from each individual's identity profile to determine if they want to bid on serving an ad to this *specific person*. As a result, by disclosing users' video viewing history to mParticle with individual identifiers, Defendants, at a minimum, identified these individuals and their video history to mParticle and any advertisers that mParticle further disclosed that information to. The full extent of mParticle's disclosure will be uncovered in discovery.

### C. The NBC Apps Each Shared Identifiable Video Viewing History with Identity Service Providers

109.     The NBC Apps collectively have millions of subscribers who use them to view prerecorded video content.

110.     Each of the NBC Apps integrated multiple identity service provider SDKs, sharing video viewing history (including the titles and identifiers of prerecorded videos) along with deterministic data (including the user's real name, email address, and GPS coordinates), as well as probabilistic data (such as device identifiers and mParticle IDs) directly attributable to that individual's personal identity profiles on each of the identity service provides referenced above.

111.     As a result, each Plaintiff and Class member's video viewing history was personally identifiable and associated with that specific individual person in violation of both the VPPA and NY VCPA.

112.     Figure 5 below shows the NBC Apps that Plaintiffs used.

**FIGURE 5**

|           | NBC App | NBC News App | NBC Sports App | MSNBC App | Bravo App |
|-----------|---------|--------------|----------------|-----------|-----------|
| Williams  | ✓       | ✓            | ✓              |           |           |
| Prevost   |         | ✓            | ✓              | ✓         |           |
| Warburton | ✓       |              | ✓              |           | ✓         |
| Tobutis   | ✓       |              | ✓              | ✓         |           |
| Meketon   |         |              |                | ✓         |           |
| Mikec     |         |              | ✓              | ✓         |           |

113.    As shown in Figure 5, Plaintiffs collectively used each of the NBC Apps at issue in this case.

### 1.    The NBC App

114.    The NBC App is an entertainment app owned by NBC that allows subscribers to view prerecorded video content, including "classic hits" and "series from more networks, including Bravo, E!, Oxygen, SYFY, USA, Telemundo and more!"

115.    To access the NBC App, users must download the app either from the App Store or the Google Play Store. In order to subscribe to the NBC App, users must provide their name and email address. Plaintiffs Williams, Warburton, and Tobutis each subscribed to the NBC App.

116.    The NBC App integrated with, at least, mParticle.

117.    The data mParticle received through the NBC App was personally identifiable because it was accompanied by information that by itself identifies each individual NBC App user, such as users' name, email address, zip code, and gender. This is reflected in the data NBC transmitted through the mParticle SDK embedded in the NBC App. Plaintiffs captured this data by intercepting transmissions to mParticle's servers from the NBC App. This data shows that the

NBC App disclosed users' video viewing details, along with their PII within the same transmission to mParticle's servers.

118.    For example, Figure 6 below is an excerpt from a transmission captured from the NBC App. This shows that the NBC App disclosed the details of the user's video viewing activity, including at least the Show, Episode Title, Season, Episode Number, Video Type, Video Duration, and Video ID, associated with that content.[4]

**FIGURE 6**

"Episode Title":"TBD", . . "Season":"5", . . . ,"Video Type":"Full Episode . . .,"Episode Number":"1", . . Show":"New Amsterdam","Video ID":"9000173936","Video Duration":"42","

119.    Within that same transmission, the NBC App also disclosed the user's PII,[5] including the User First Name, User Last Name, User Zip Code, User Gender, User Zip Code and email address, advertising ID. It even reported that the email address was valid.[6]

**FIGURE 7**



120.    The presence of this PII with video viewing history details in the same transmission to mParticle permits an ordinary recipient to identify Plaintiffs' video-watching habits, with little or no extra effort, in violation of the VPPA. In addition, this data is added and cross-referenced to each user's identity profile once in mParticle's system, along with additional identifying

---

[4] A list of New Amsterdam episodes confirms that Episode Number 1 of Season 5 is in fact titled "TBD." *See "*List of New Amsterdam Episodes," Wikipedia, https://en.wikipedia.org/wiki/List_of_New_Amsterdam_episodes (last visited Sept. 12, 2025).
[5] PII in this example, and each subsequent example, has been redacted to preserve the user's privacy.
[6] GAID is short for Google Advertising ID, which is equivalent to AAID.

information and other data as NBC App users watch content on the NBC App and other NBC Apps. *See* Paragraphs 92-95.

121.    Plaintiffs' and each individual NBC App user's video viewing history was identifiable to the ordinary person as shown above. This video viewing history, as a result of Defendants' disclosure of PII including names, email addresses, gender, and zip code, was directly identifiable, as this is information that identifies a specific person even without any additional linking.

122.    The NBC App transmitted this information regardless of user's device settings. The NBC App did not prompt users to opt out of mParticle's services. And mParticle does not provide end-users, like Plaintiffs or Class members, with the option to opt out of or disable their persistent cross-platform identity services at the time of collection.

123.    Plaintiffs Williams, Warburton, and Tobutis used the NBC App to watch prerecorded videos. *See* Paragraphs 10-21, 34-43, 44-53. As a result, The NBC App transmitted individually identifiable information reflecting these Plaintiffs' video viewing histories to the identity service providers described above.

### 2.    The NBC News App

124.    The NBC News App is a news app that allows subscribers to view prerecorded video content such as U.S. news, world news, business news, and health and culture news.

125.    To access content on the NBC News App, users must download the app either from the App Store or Google Play and subscribe to the app using their name email address. Plaintiffs Williams and Prevost subscribed to the NBC News App using their name and emails address.

126.    The NBC News App integrated with, at least, mParticle.

127.    The data mParticle received through the NBC News App was personally identifiable because it was accompanied by information that by itself identifies and individual

NBC News App user, such as users' GPS location and email addresses. This is reflected in the data NBC transmitted through the mParticle SDK embedded in the NBC News App. Plaintiffs captured this data by intercepting transmissions to mParticle's servers from the NBC News App. This data showed that the NBC News App disclosed the user's video viewing details, along with their PII within the same transmission to mparticle's servers.

128.     For example, the image below is an excerpt from a transmission captured from the NBC News App. This shows that the NBC News App disclosed the details of the user's video viewing activity, including at least the Video Title, Video Playlist Name, Video Program, and Video GUID associated with that content. The example below also includes the user's unique Adobe ECID, a persistent identifier used to join that data to other identifying information within Adobe's identity service, and more broadly, to match information associated with that identifier together outside Adobe's systems (as shown here).

**FIGURE 8**



129.     Within that same transmission, the NBC News App also disclosed the users PII. This includes at least user's email address:

**FIGURE 9**



130.     And when location is enabled, the NBC News App also discloses that user's precise GPS Location:

**FIGURE 10**



131.    The presence of this PII with video viewing history details in the same transmission to mParticle permits an ordinary recipient to identify Plaintiffs' video-watching habits, with little or no extra effort, in violation of the VPPA. In addition, this data is added and cross-referenced to each user's identity profile once in mParticle's system, along with additional identifying information and other data as NBC News App users watch content on the NBC News App and other NBC Apps. *See* Paragraphs 92-95.

132.    Plaintiffs' and each individual NBC News App user's video viewing history was identifiable as shown above. This video viewing history, as a result of NBC's disclosure of PII, including their email address and GPS Location, was directly identifiable as it identifies a specific person even without any additional linking.

133.    Plaintiffs' and each individual NBC News App user's video viewing history was identifiable. This is especially true because it received, not only video titles, but also, at least, the user's email address and GPS location with that video viewing information. This video viewing history, as a result, was directly identifiable, because email addresses and GPS location are personal information that identifies a specific person even without any additional linking.

134.    The NBC News App transmitted this information regardless of users' device settings. The NBC News App did not prompt users to opt out of mParticle's services. And mParticle does not provide end-users, like Plaintiffs or Class members, with the option to opt out of or disable their persistent cross-platform identity services at the time of collection.

135.    Plaintiffs Williams and Prevost used the NBC News App to watch prerecorded videos. *See* Paragraphs 10-21, 22-33. As a result, the NBC News App transmitted identifiable

information reflecting these Plaintiffs' video viewing history to the identity service providers above.

### 3.    The MSNBC App

136.    The MSNBC App is a news app that allows subscribers to view prerecorded video content, including "full episodes of your favorite MSNBC shows."

137.    To access content on the MSNBC App, users must download the app either from the App Store or Google Play.  Additionally, Plaintiff Prevost, Tobutis, Meketon, and Mikec each subscribed to the MSNBC App using their name and email address.

138.    The MSNBC App integrated with, at least mParticle.

139.    The data mParticle received through the MSNBC App was personally identifiable because it was accompanied by information that by itself identifies each individual MSNBC App user including, at least, their email address. This is reflected in the data Defendants transmitted through the mParticle SDK embedded in the MSNBC App. Plaintiffs captured this data by intercepting transmissions to mParticle's servers from the MSNBC App. This data showed that the MSNBC App disclosed users' video viewing details, along with their PII within the same transmission to mParticle's servers.

140.    For example, the image below is an excerpt from a transmission captured from the MSNBC App. This shows that the MSNBC App disclosed the details of the user's video viewing activity, including at least the Video Program, Video Title, Video Air Date, Video Playlist Name, and Video Length, associated with that content.

## FIGURE 11

","video content source":"msnbc","video clip category":"broadcast","video content type":"Video","video guid":"n_maddow_humiliations_250225","video initiation":"Manual","screen reader":"off","video playlist id":"nnd_26548304-nnd","video playlist name":"Rachel Maddow","product name":"MSNBC","app tier":"production","video title":"Busted: DOGE humiliated by brutal fact-checking, walks back bogus savings claims","video program":"Rachel Maddow","video air date":"2025-02-26T05:42:53Z","video index start":"2","video length":"420",

141.    Within that same transmission, the MSNBC App also disclosed the users PII to mParticle, including its email address:

## FIGURE 12



5,"nc":"us","it":false,"idst":false,"lat":true},"ui":[{"n":7,"i":"▮▮▮▮▮@gmail.com","dfs":▮▮▮▮▮,"f":true}],"ua":{}}

142.    The presence of this PII with video viewing history details in the same transmission to mParticle permits an ordinary recipient to identify Plaintiffs' video-watching habits, with little or no extra effort, in violation of the VPPA. In addition, this data is added and cross-referenced to each user's identity profile once in mParticle's system, along with additional identifying information and other data as MSNBC App users watch content on the MSNBC App and other NBC Apps. *See* Paragraphs 92-95.

143.    Plaintiffs' and each individual MSNBC App user's video viewing history was identifiable as shown above. This video viewing history, as a result of the MSNBC App's disclosure of PII including email addresses, was directly identifiable as email addresses are personal information that identify a specific person even without any additional linking.

144.    The MSNBC App transmitted this information regardless of user's device settings. The MSNBC App did not prompt users to opt out of mParticle's services. And mParticle does not

provide end-users, like Plaintiffs or Class members, with the option to opt out of or disable their persistent cross-platform identity services at the time of collection.

145.    Plaintiff Prevost, Tobutis, and Meketon used the MSNBC App to watch prerecorded videos. *See* Paragraphs 22-33, 44-53, 54-61, 62-70. As a result, the MSNBC App transmitted individually identifiable information about their video viewing history to the identity service providers described above.

### 4.    The NBC Sports App

146.    The NBC Sports App is a sports news app that allows subscribers to view prerecorded video content, including highlights from sporting events and episodes of NBC TV shows.

147.    To access content on the NBC Sports App, users must download the app either from the App Store or Google Play. To access additional "locked" content, users must additionally subscribe to the NBC Sports App by providing their name and email address. Plaintiffs Williams, Prevost, Warburton, Tobutis, and Mikec subscribed to the NBC Sports App using their name and email address.

148.    The NBC Sports App integrated with, at least, mParticle.

149.    The data mParticle received through the NBC Sports App was personally identifiable because it was accompanied by information that by itself that identifies each individual NBC Sports user. This is reflected in the data NBC transmitted through the mParticle SDK embedded in the NBC Sports App. Plaintiffs captured this data by intercepting transmissions to mParticle's servers from the NBC Sports App. This data showed that the NBC Sports App disclosed users' video viewing details, along with their PII within the same transmission to mParticle's servers.

150.    For example, the image below is an excerpt from a transmission captured from the NBC Sports App. This shows that the NBC Sports App disclosed the details of the user's video viewing activity, including at least the Episode Title, Video Title, and Sport associated with that content.

**FIGURE 13**

"Episode Title":"Highlights: <video2.title -> Michelin Pilot Challenge at Sebring>","Ad Blocker":"False","Product":"NBC Sports App","Branch Tags":"None","Sport":"Motor Sports","Push Opt-Out":"False","Token Type":"None","UTM Medium":"None","Video Type":"Short-Form VOD","League":"IMSA","Orientation":"Landscape","UTM Campaign":"None","Brand":"NBC Sports",

151.    Within that same transmission, the NBC Sports App also disclosed the user's PII to mParticle, including their email address and advertising ID:

**FIGURE 14**



152.    The presence of this PII with video viewing history details in the same transmission to mParticle permits an ordinary recipient to identify Plaintiffs' video-watching habits, with little or no extra effort, in violation of the VPPA. In addition, this data is added and cross-referenced to each users' identity profile once in mParticle's system, along with additional identifying information and other data as NBC Sports App users watch content on the NBC Sports App and other NBC Apps. *See* Paragraphs 92-95.

153.    Plaintiffs' and each individual NBC Sports App user's video viewing history was identifiable as shown above. This video viewing history, as a result of the NBC Sports App's

disclosure of PII, including email addresses, was directly identifiable as email addresses are personal information that identify a specific person even without any additional linking.

154.    The NBC Sports App transmitted this information regardless of users' device settings. The NBC Sports App did not prompt users to opt out of mParticle's services. And mParticle does not provide end-users, like Plaintiffs or Class members, with the option to opt out of or disable their persistent cross-platform identity services at the time of collection.

155.    Plaintiffs Williams, Prevost, Warburton, Tobutis, and Mikec used the NBC Sports App to watch prerecorded videos. *See* Paragraphs 10-43, 44-53, 62-70. As a result, the NBC Sports App transmitted individually identifiable information about these Plaintiffs' video viewing history to the identity service providers described above.

### 5.    The Bravo App

156.    The Bravo App is an entertainment app that allows subscribers to view prerecorded video content, including videos of their favorite Bravo-developed shows like The Real Housewives and other reality TV shows.

157.    To access content on the Bravo App, users must download the app either from the App Store or Google Play. To access additional "locked" content, users must subscribe to the Bravo App by providing their name and email address. Plaintiff Warburton subscribed to the Bravo App using his name and email address.

158.    The Bravo App integrated with, at least, mParticle.

159.    The data mParticle received through the Bravo App was personally identifiable because it was accompanied by information that by itself identifies each individual Bravo App user. This is reflected in the data NBC transmitted through the mParticle SDK embedded in the Bravo App. Plaintiffs captured this data by intercepting transmissions to mParticle's servers from

the Bravo App. This data showed that the Bravo App disclosed users' video viewing details, along with their PII within the same transmission to mParticle's servers.

160.    For example, the image below is an excerpt from a transmission captured from the Bravo App. This shows that the Bravo App disclosed the details of the user's video viewing activity, including at least the Episode Title, Show, and duration associated with that content:

**FIGURE 15**

```
":{"Platform":"Android","Episode Title":<video1.episode -> "Las Vegas Finals 4">,"Ad
Blocker":"False","Product":"Bravo App","Playlist Position":"None","Branch
Tags":"None","Sport":"None","Push Opt-Out":"False","UTM Medium":"None","Ad Pod
Type":"Preroll","Video Type":"Full Episode","League":"None","Orientation":"Landscape","UTM
Campaign":"None","Brand":"NBC","Page Type":"Video Player","Ad Audience":"None","Branch
Feature":"None","Show":<video1.name -> "American Ninja Warrior">,"Video Duration":"84","
```

161.    Within that same transmission, the Bravo App also disclosed the user's PII to mParticle, including their email address, User First Name, User Last Name, User Zip Code, and User Gender. It even confirmed the user's email address was valid:

**FIGURE 16**



162.    The presence of this PII with video viewing history details in the same transmission to mParticle permits an ordinary recipient to identify Plaintiffs' video-watching habits, with little or no extra effort, in violation of the VPPA. In addition, this data is added and cross-referenced to each user's identity profile once in mParticle's system, along with additional identifying information and other data as Bravo App users watch content on the Bravo App and other NBC Apps. *See* Paragraphs 92-95.

163.    Plaintiffs' and each individual Bravo App user's video viewing history was identifiable as shown above. This video viewing history, as a result of the Bravo App's disclosure of PII including email addresses, full names, zip codes, and gender, was directly identifiable as this is personal information that identifies a specific person even without any additional linking.

164.    Plaintiffs' and each individual Bravo App user's video viewing history was identifiable. This is especially true because the Bravo App sent, at least, video titles reflecting prerecorded video content viewed by its users to mParticle with that user's email address. This video viewing history, as a result, was directly identifiable, as email addresses are personal information that identifies a specific person even without any additional linking.

165.    The Bravo App transmitted this information regardless of users' device settings. The Bravo App did not prompt users to opt out of mParticle's services. And mParticle does not provide end-users, like Plaintiffs or Class members, with the option to opt out of or disable their persistent cross-platform identity services at the time of collection.

166.    Plaintiff Warburton used the Bravo App to watch prerecorded videos. *See* Paragraphs 34-43. As a result, the Bravo App transmitted individually identifiable information and Plaintiff Warburton's video viewing history to the identity service provider described above.

**D.    NBC Apps Subscribers Did Not Consent to Disclosure**

167.    Plaintiffs and Class members did not consent to NBC's disclosure of their video viewing history and personally identifiable information.

168.    The VPPA requires Defendants to obtain informed, written consent from subscribers before disclosing their video viewing history and personally identifiable information with third parties.

169.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of

the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. The NBC Apps do not provide any separate written consent form at the time of sign up,[7] or otherwise in a form that meets these requirements.

170.    Defendants did not comply with the VPPA by failing to obtain the informed, written consent of Plaintiffs and the Class to share their identifiable video viewing history and personally identifiable information with third parties, including the identity service providers described herein.

171.    Therefore, Defendants failed to obtain informed, written consent in compliance with VPPA.

172.    Defendants also failed to obtain informed, written consent in compliance with the NY VCPA. *See* Paragraph 223, *infra*.

**E.      Plaintiffs and Class Members Were Harmed by NBC's Privacy Violations**

173.    Defendants' conduct violates Plaintiffs' and Class members' privacy rights and deprived them of control over their personal information.

174.    Defendants' conduct inflicted exactly the type of harm on Plaintiffs and Class members that the VPPA and the NY VCPA were designed to prevent.

175.    The VPPA was passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where

---

[7] The NBC Sports App currently does contain a disclosure concerning sharing of video viewing history. Upon information and belief, this disclosure was not present during the entirety of the Class Period and does not comply with the disclosure requirements of the NY VCPA.

that information goes." S. REP. No. 100-599 at 6-7 (1988). Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. REP. No. 100-599 at 7 (1988) (statements of Sens. Simon and Leahy, respectively).

176.    In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 CONG. REC. S5399 (daily ed. May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

177.    These statements resonate even more now than they did in 1988 when the VPPA was passed, as data mining from online activities is more common and sophisticated than ever before, as reflected by the comprehensive identity services described herein. During a Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

178.    Similarly, in 1993, the New York State Senate became concerned about personal privacy. Specifically, the legislature acknowledged the widespread popularity of viewing rented video tapes and movies in the home through various retailers. In doing so, "innumerable retail establishments in this state commonly record, often by computer, data containing the identifies of consumers who have rented video tapes and movies and the titles of the videos rented."[8] The legislature was concerned about the risk of public dissemination of personally identifiable information. The legislature believed that this is a matter of state concern due to the large amounts of personal identifiable information being collected and poses a serious threat to New Yorkers.[9] And this is without even considering the identity service providers described throughout this complaint, whose purpose is to aggregate data to identify specific individuals.

179.    In passing the NY VCPA, the legislature's intent was to "protect the personal privacy of individuals and their families who rent video cassette tapes and movies and similar audio-visual materials, without unreasonably restricting the ability of video tape service providers to collect and use information as is necessary to conducting their business."[10]

180.    In this case, Defendants violated Plaintiffs' and Class members' privacy rights by purposely disclosing their video viewing activity and personally identifiable information to third parties, including identity service providers whose entire purpose is to use that data to identify specific individuals. Plaintiffs and Class members reasonably expected their viewing histories, preferences, personally identifiable information, and identities would be kept private.

181.    The personal information Defendants obtained from Plaintiffs and Class members is valuable data in the digital advertising-related market for consumer information.

---

[8] N.Y. GEN. BUS. LAW § 671.
[9] *Id.*
[10] *Id.*

182.    Because NBC places advertisements alongside its prerecorded video content and embeds commercials within its video content, NBC is incentivized to enhance the "targeting" of such ads, allowing companies who pay NBC to advertise reach their "ideal" audience.

183.    NBC benefits at Plaintiffs' and Class members' expense, where Plaintiffs and Class members never consented to NBC's disclosure of their personally identifiable information.

184.    The harms described above are aggravated by NBC's continued retention and commercial use of Plaintiffs' and Class members' personal information, including their private video viewing histories.

## CLASS ALLEGATIONS

185.    Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following class:

> All persons in the United States who subscribed to an NBC App and viewed prerecorded video content on an NBC App during the period September 1, 2013 to the present ("Class Period") (the "Class").

186.    Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

187.    Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which NBC or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

188.    **Numerosity**: The Class consists of at least hundreds of thousands of individuals, making joinder impractical.

189.    **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include, but are not limited to:

(a)    Whether Defendants' use and disclosure of Plaintiffs' and Class members' personally identifiable information and video viewing history was without user consent or authorization;

(b)    Whether Defendants obtained and shared, or caused to be obtained and shared, Plaintiffs' and Class members' personally identifiable information;

(c)    Whether Defendant's disclosures were committed knowingly;

(d)    Whether Defendants disclosed Plaintiffs' and Class members' personal information as a result of Defendants' conduct described herein;

(e)    Whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*.;

(f)    Whether Defendants' conduct violates N.Y. GEN. BUS. LAW § 349;

(g)    Whether Defendants' conduct violates New York Video Consumer Privacy Act, N.Y. GBL § 670, *et seq*.;

(h)    Whether Defendants' acquisition and transmission of Plaintiffs' and Class members' personal information resulted in harm; and

(i)    Whether Defendants should be enjoined from engaging in such conduct in the future.

190.    **Typicality**: Plaintiffs' claims are typical of the claims of Class members in that Plaintiffs, like all Class members, have been injured by NBC's misconduct—disclosing

subscribers' personally identifiable information and viewing content to Third parties without consent.

191.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

192.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce NBC to comply with federal and state law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of NBC's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

193.    **Injunctive relief**: Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

194.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

195.    Defendants secretly incorporated the third parties' SDKs into NBC Apps, providing no indication to users that they were interacting with apps that shared their data, including personally identifiable information and video viewing histories, in such a way that the video viewing history could be associated with their individual identity.

196.    Plaintiffs and Class members could not have discovered the full scope of Defendant's conduct at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendant, including, but not limited to: (1) there were no disclosures or other indication that would inform a reasonable consumer that NBC was disclosing, and third parties were receiving and/or intercepting, personally identifiable information and video viewing history from NBC Apps; (2) the manner in which NBC shares users' personally identifiable information and video viewing history from NBC Apps to third parties is highly technical; and (3) deciphering the coding language that transmits users' personally identifiable information and video viewing history from NBC Apps to third parties requires advanced expertise, beyond the scope of a reasonable consumer.

197.    Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations under the discovery rule.

198.    Plaintiffs and Class members were not aware that Defendants disclosed and intercepted their data, including personally identifiable information and video viewing history.

199.    Plaintiffs and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendants' misconduct by virtue of their fraudulent concealment.

200.    Accordingly, all statutes of limitation are tolled under the doctrine of fraudulent concealment.

## NEW YORK LAW APPLIES TO THE CLASS

201.    New York's substantive laws apply to every member of the Class, regardless of where in the United States the Class member resides.

202.    NBCUniversal's Terms of Service state: "These TOS [Terms of Service], any Supplemental Terms, and the relationship between you and us shall be governed by the laws of the U.S. and the State of New York without regard to its conflicts of law provisions."[11]

203.    By choosing New York law for the resolution of disputes in the agreements, Defendants conceded that it is appropriate for this Court to apply New York law to the instant dispute.

204.    Further, New York's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV § 1 of the U.S. Constitution. New York has significant contacts, or a significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interest that ensures that the choice of New York state law is not arbitrary or unfair.

205.    NBCUniversal and NBC Digital's headquarters and principal places of business are located in New York. Defendants also own property and conduct substantial business in New York, and therefore New York has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New York and/or avail themselves of New York's laws, and to engage in the challenged conduct from and emanating out of New York, renders the application of New York law to the claims herein constitutionally permissible.

206.    New York is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiffs and all other Class members.

207.    The application of New York laws to the Class is also appropriate under New York's choice of law rules because New York has significant contacts to the claims of Plaintiffs

---

[11] This also applies to NBCUniversal' "affiliated companies" such as NBC Digital.

and the proposed Class, and New York has a greater interest in applying its laws here than any other interested state.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
(Video Privacy Protection Act) 18 U.S.C. § 2710, *et seq.*
(On Behalf of Plaintiffs and Class)

208.    Plaintiffs incorporate and reallege the above factual allegations by reference.

209.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

210.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Each Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because they engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiffs viewed on NBC Apps—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

211.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and Class members are subscribers of the NBC Apps, which provide video content to users. Plaintiffs and Class members are subscribers under the VPPA because they downloaded NBC Apps and provided NBC, at a minimum, their full names, email address, GPS coordinates, the title of the videos they

viewed, and/or paid a monthly or annual fee, in order to view prerecorded video content on the NBC Apps.

212.    As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

213.    Defendants knowingly caused Plaintiffs' and Class members' video viewing information to be disclosed to third parties, including identity service provider mParticle, along with personally identifying information, including their full name, email address, and GPS coordinates. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member individually to third parties either directly or when combined with personally identifiable information already in their possession, as the individual who viewed Defendants' content, including the specific prerecorded video materials watched on NBC Apps. This information allowed third parties, including at least the identity service providers described above, to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

214.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendants failed to obtain informed, written consent under this definition.

215.    Defendants were aware that the disclosures to third parties that it shared through SDKs it incorporated in NBC Apps personally identified Plaintiffs and Class members. Indeed,

mParticle publicly touts its abilities to identify specific individuals through their identity profiles. Defendants also knew that Plaintiffs' and Class members' video viewing history was directly identifiable because the NBC Apps disclosed names, email addresses, and GPS coordinates with video titles to mParticle. This personally identifiable information not only identified Plaintiffs and Class members who used those specific apps to mParticle, but it allowed mParticle to identify each Plaintiff's video viewing history by joining the personally identifiable information received from one NBC App with those received from others. This benefited mParticle by allowing it to build more complete identity profiles on NBC App users, which in turn were sold to advertisers looking to target these specific individuals with ads. It benefited NBC by allowing it to sell ads to these individuals within its own apps and networks, as well as delivering individualized intelligence about its users' behavior within the NBC Apps.

216.    By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Defendants violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits and Plaintiffs and the class were damaged. *See* 18 U.S.C. § 2710(c).

217.    As a result of the above violations, Defendants are liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500 per violation." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Defendants are also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendants in the future.

## SECOND CLAIM FOR RELIEF

### NEW YORK VIDEO CONSUMER PROTECTION ACT
### N.Y. GEN. BUS. LAW §§ 670-675
### (On Behalf of Plaintiffs and the Class)

218.    Plaintiffs repeat the allegations contained above, as if set forth fully herein.

219.    Plaintiffs are "consumers" because they are "subscriber[s] of goods or services from a video tape service provider." N.Y. GEN. BUS. LAW § 672(1). Plaintiffs and Class members are subscribers of the NBC Apps, which provide video content to users. Plaintiffs and Class members are subscribers under the NY VCPA because they downloaded NBC Apps and provided Defendants, at a minimum, their email address, the title of the videos they viewed, and/or paid a monthly or annual fee, in order to view prerecorded video content on the NBC Apps.

220.    Each Defendant is a "video tape service provider" because they are "engaged in the business of rental of prerecorded video cassette tapes or similar audiovisual materials[,]" N.Y. GEN. BUS. LAW § 672(4), including the prerecorded videos that Plaintiffs viewed on NBC Apps—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

221.    "Personally identifiable information" is "information that identifies a person as having requested or obtained specific video materials or services from a video tape service provider." N.Y. GEN. BUS. LAW § 672(3).

222.    Defendants knowingly caused Plaintiffs' and Class members' video viewing information, and other unique cross-platform tracking identifiers, as well as personally identifying information, including their full name, email address, and GPS coordinates, to be disclosed to third parties, including identity service provider mParticle. This information constitutes personally identifiable information under N.Y. GEN. BUS. LAW § 672(3) because it identified each Plaintiff and Class members individually to third parties either directly or when combined with personally

identifiable information already in their possession as an individual who obtained specific video materials or services from Defendants through NBC Apps. This information allowed third parties, including at least mParticle described above to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

223.    As set forth in N.Y. Gen. Bus. Law § 672(6), "informed, written consent" must be (1) "in writing in at least ten point bold face type, affixed to any membership, subscriber or rental agreement between the consumer and the video tape service provider, and shall be posted on a sign in full and clear view of the consumer at the point of rental transaction;" and (2) be drafted to include the language provided by N.Y. Gen. Bus. Law § 672(6).[12] Defendants failed to obtain informed, written consent under this definition.

224.    Defendants were aware that the disclosures to third parties that it shared through SDKs personally identified Plaintiffs and Class members. Indeed, mParticle publicly touts its abilities to identify specific individuals through their identity profiles. Defendants also knew that Plaintiffs' and Class members' video viewing history was directly identifiable because at least certain NBC Apps disclosed names, email addresses and GPS coordinates with video titles to mParticle. This personally identifiable information not only identified Plaintiffs and Class members who used those specific apps to mParticle, but it allowed them to identify each Plaintiff's video viewing history by joining the personally identifiable information received from one NBC

---

[12] "This video tape service provider from time to time provides to marketers of goods and services, the names and addresses of customers and a description or subject matter of materials rented by video customers. You have the right to elect not to have your name, address or the description or subject matter of any material rented included in such lists. This election may be changed by you, in writing, at any time.
I do not object to the release of my name, address or the description or subject matter of the material rented.

_____
Signature
I do object to the release of such information.

_____
Signature"

App with those received from others. This benefited mParticle by allowing it to build more complete identity profiles on NBC App users, which in turn were sold to advertisers looking to target these specific individuals with ads. It benefited NBC by allowing it to sell ads to these individuals within its own apps and networks, as well as delivering individualized intelligence about its users' behavior within the NBC Apps.

225.     In accordance with N.Y. GEN. BUS. LAW § 675, the Plaintiffs and members of the proposed Class have been injured for violations of N.Y. GEN. BUS. LAW § 673(5) and seek damages of not less than $500 for said violations, regardless of the actual amount of damages proved, plus costs, disbursements, and reasonable attorneys' fees.

226.     By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Defendants violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits and Plaintiffs and the class were damaged. *See* N.Y. GEN. BUS. LAW § 675.

227.     As a result of the above violations, Defendants are liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "not less than five hundred dollars in damages, regardless of the amount of actual damage proved[.]" N.Y. GEN. BUS. LAW § 675(1). Under the NY VCPA, Defendants are also liable for reasonable attorney's fees, other litigation costs.

## THIRD CLAIM FOR RELIEF

### NEW YORK'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### N.Y. GEN. BUS. LAW § 349
### (On Behalf of Plaintiffs and the Class)

228.     Plaintiffs repeat the allegations contained above, as if fully set forth herein.

229.     N.Y. GEN. BUS. LAW § 349 ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

230.    As consumers of NBC's services, Plaintiffs and Class members are "person[s]" within the meaning of GBL § 349.

231.    Plaintiffs are authorized to bring a private action under GBL § 349(h).

232.    Defendants conducted business, trade, or commerce in New York State.

233.    Plaintiffs and Class members viewed videos in connection with transactions in "business," "trade," or "commerce" within the meaning of GBL § 349.

234.    This count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts related to Defendants': (a) omissions of disclosures required under the VPPA, 18 U.S.C. § 2710(b)(2)(B) and NY VCPA, N.Y. GEN. BUS. LAW § 672(6) for the sharing of personally identifiable information and video viewing history; (b) failure to disclose its practice of sharing Plaintiffs' and Class members' personally identifiable information and video viewing histories to third parties, revealing the identity of individuals who watched specific videos; and (c) their practice of collecting and consolidating identifying data from Plaintiffs and Class members regardless of their device settings.

235.    Defendants systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of Plaintiffs and Class members.

236.    Defendants willfully engaged in such acts and practices and knew or acted in reckless disregard for whether they violated GBL § 349.

237.    Defendants' representations and omissions were material because NBC subscribers, including Plaintiffs and Class members, would not have used NBC's services, or would have paid less for such services (where applicable), had they known that NBC would disclose Plaintiffs' and Class members' personally identifiable information and video viewing

histories that could be associated with their individual identity, without Plaintiffs' or the Class members' knowledge or consent, to third parties.

238.    Plaintiffs and Class members relied on Defendants' deceptive representations and omissions when they subscribed for NBC's products and services.

239.    Plaintiffs and Class members had no way of knowing Defendants secretly disclosed Plaintiffs' and Class members' personally identifiable information and video viewing histories in such a way that the video viewing history could be associated with their individual identity, without Plaintiffs' or the Class members' knowledge or consent, to third parties.

240.    Plaintiffs and Class members have been injured as a direct and proximate result of Defendants' violations because they would not have: (i) exposed themselves to privacy harm, and/or (ii) purchased (or would have paid significantly less for) NBC's services, had they known that their personally identifiable information and video viewing histories would be shared in such a way that the video viewing history could be associated with their individual identity, without Plaintiffs' or the Class members' knowledge or consent, to third parties.

241.    The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50, whichever is greater, treble damages, injunctive relief, and attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

242.    Plaintiffs repeat the allegations contained above, as if fully set forth herein.

243.    Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

244.    Defendants received benefits from Plaintiffs and Class members in the form of the Plaintiffs' highly valuable data, including personally identifiable information and video viewing history, that Defendants wrongfully disclosed to third parties without authorization and proper compensation. Defendants' retention of these ill-gotten gains is unjust and inequitable.

245.    Defendants disclosed and used this data for their own gain, providing Defendants with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

246.    Had Plaintiffs known of Defendants' misconduct, they would not have provided any of their data to Defendants or have used or paid to use NBC Apps.

247.    Defendants unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

248.    The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in New York and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

249.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A.     Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

B.     Enter judgment in favor of Plaintiffs and the Class;

C.     Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

D.     Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

E.     Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.     Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

G.     Enter such other orders as may be necessary to restore to Plaintiffs and Class members any money and property acquired by Defendants through their wrongful conduct;

H.     Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

I.     Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: September 12, 2025                                    Respectfully submitted,

*/s/ Christian Levis*
Christian Levis
Nicole A. Veno
Amanda Fiorilla
Claire Noelle Forde
Katherine Boyd
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
nveno@lowey.com
afiorilla@lowey.com
nforde@lowey.com
kboyd@lowey.com

Carol C. Villegas
Michael P. Canty
Danielle Izzo
Gloria J. Medina
**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Fl.
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com
dizzo@labaton.com
gmedina@labaton.com

*Attorneys for Plaintiffs*